We'll hear our argument next in Omega v. 375 Canal, 19969. Please proceed. Misha Zaitlin for 375 Canal. Under the verdict on appeal, 375 Canal and landlord must pay Omega over a million dollars because a new occupant of the property sold one counterfeit watch to Omega's agents, even though it was undisputed that there was not even an allegation that that occupant had ever sold an Omega watch before. The one watch thing, that's a creature of the statutory damages, right, because you calculate damages per type of goods sold per mark, right? So if it's one watch or if it's 100 of the same watch with the same marks, it would be the same amount of damages, right? Well, right. The issue with regard to the one watch is that this was the first time that this occupant had sold a watch. And that's not just a lawyer's argument. That was an explicit concession by Omega that there was never a single other – there's not even an allegation in this case that this occupant had ever sold an Omega counterfeit watch. That's your reading of the 56.1 statement. That's right. It's unambiguous. That is what the statement says. And that it was the second factual allegation, and it framed the summary judgment and it framed the entire trial. If it's the same seller selling the watch, so if they proceed under a willful blindness theory and they argue that 375 Canal just wasn't paying – like purposefully was not paying attention to who was invading trademarks in their space, why do they need to show that it's the same person selling the watch? Right. So the wording of this court in Tiffany and the Supreme Court in what is important here, the wording is that there is secondary liability when you continue to supply your property to one who you know or should have known is – Tiffany, we also then say that if Tiffany could show that eBay was intentionally shielding itself from discovering the offending listings or the identity of the sellers behind them, it would also have met the knowledge requirement. Don't we say that too? Yes. But it has to be with regard to the specific one infringer. It is – that way of articulating would collapse. I mean, you're making a lot out of this word one that, you know, I think if you asked our colleagues in Tiffany whether that was what they were thinking about, just reading the decision, the opinion, it's clear that that's not what they're – that's not the focus. That's not a holding. With respect, Your Honor, the one is italicized in the opinion. And then immediately after, they talk about that footnote in Sony which says the words identified individuals. So the one – Why would it make sense to have a rule that says you can't shield yourself from knowing the identity of an infringing seller on your premises and then have the rule be that that only applies if the infringing seller turns out to be a repeat seller? That makes no sense to me. I mean, I understand the one being used in the abstract to mean any person who, one who does that. Right, Your Honor. But not that it has to be the identical person because the very fact of shielding means you don't know who's selling the offending merchandise. And the Tiffany rule is you can't shield yourself from knowing that there's a person that is selling offending merchandise on your premises. But what Tiffany says in the willful blindness section is that what you can't do is you can't be made aware that there's a current problem on your property and then shield yourself. Here what happened was more than a year ago there was an alleged problem on the property. That occupant was removed. That direct infringer was removed. Then there was no problem for an entire year. There was visual inspections by Omega. So the question about whether it matters that it's just your marks or whether the other marks matter too. So isn't it a different case if we have one Omega infringement at time one and then a second Omega infringement at time two and no other evidence? Doesn't it matter? Doesn't it make it more likely that the landlord wasn't paying attention if we have an Omega infringement at time one and then a whole bunch of other trademark infringement of other marks all throughout that time until we get to the second Omega infringement at time two? Your Honor, there's no need to deal with that hypothetical here. All of the other ones were in the past. They were three years ago, seven years ago. There was not a single noted problem once this new occupant took occupancy. There was not a problem for a full year. They had multiple visual inspections, December 11th, December 30th. It was uncontroverted that we had visual inspections. The rule that they are ---- It seems like you're saying that that would be relevant if the other trademark infringement was happening at time one. You're just saying it's way in the past, so it's not a problem. Our position is that infringement of other marks is not relevant, but our position here is that the Court need not resolve this issue because there was no problem here from the entire time that this new occupant was in the property. The emphasis in Inwood and in Tiffany is this is a narrow standard. If Your Honors were to accept the district court's ---- If we accept your version of Tiffany, then your view is that we can only look at that one tenant during this one limited period of time and see if there was more than one accusation of trademark infringement. No. What I'm saying, Your Honor, is there has to be a reason to suspect the current occupant. Once you remove the problematic prior occupant ---- The reason might be a prior incidence of infringement. But if there's no relationship between –– there's no legal or factual relationship between the current occupant and the prior occupant, then under the specific identified individual relationship, right? Because the –– even it's undisputed that the prior occupant was a subtenant of the tenant that remains the current tenant, right? The tenant issue is a distraction. That was just a real estate entity that was getting some arbitrage from renting from us and sent to them. There's no argument that that tenant had some sort of –– was a seller or was a direct infringer. So the existence of the tenant is just a distraction. But if I may, I do have a couple of other issues that I think are clear legal errors that I would like to discuss. Even under my friend's understanding of Tiffany and Inwood, they concede that they have to prove a prior sale of omega-infringing good. But here there is only one bit of alleged evidence that that prior sale of any omega good occurred here. That was –– That's right. That's right. This was the only piece of evidence that they submitted in the entire trial that there had ever been any omega infringement at this property ever, which was a single line in a private e-mail account sent by a police officer recounting allegedly the contents of a arrest log. With respect, that is clearly inadmissible hearsay. In fact, it's closer to double hearsay because it's the officer telling omega about the contents of an arrest log, which itself is hearsay. In the e-mail correspondence that we have in the record, the lawyer for omega says to the officer, would you be able to share with me a copy of your arrest log for the omega seizures your unit did yesterday? And he says, I'll do that when I get back to the office. And then he responds later when he's back in the office with what looks like a copy and paste out of the arrest log, doesn't it? It may look like that, but it's clearly not the arrest log. We have his testimony, their star witness, the officer's testimony on JA 2235. There we asked him, could omega have obtained the actual arrest log as the complainant? And he says yes. Did they ask for it? No. So this is just him recounting what is an arrest log in a pretty hasty e-mail when he makes an error as to the number of arrests. If they were to obtain the original arrest log, it would still be a copy of the original arrest log. They don't actually get the one only copy that the police department has, right? That's true, Your Honor, but this is not the actual arrest log. This is a retyping of a portion of the arrest log. For a Xerox, it would be different than if it was copied and pasted out of the log? Well, we don't know that if it was actually copied and pasted. It seems what was here was retyped. And the importance of the retyping is it lacks the solemnity of an arrest log. And what the rule says for business records is that the record to be admitted must be kept for a public purpose. We have a concession from my friends, a concession by silence, that this e-mail sent from a private e-mail account was never kept by the New York What about the public record exception? So to be a public record, it has to recount factual findings that were made pursuant to a legally authorized investigation. Isn't that what this is doing here? No, the arrest log recounts it. This is just a retyping of alleged retyping of the arrest log. And I will note for all of the The public records exception doesn't require the keeping the way the business record does. My question is, if this is an account from the officer of the results of their legally authorized investigation into trademark infringement on these properties, why doesn't that qualify as a public record? Just because you're not convinced that it matches the original. Well, what Wright and Miller say, 6882, is that those two exceptions are parallel. It would be passing strange, I would submit, that if a business needs to keep it, that any e-mail sent by any officer could be. And I think my friends know that they're in a bit of trouble on this, which is why on appeal they come up with this new exception that was never raised below, which this Court has said only applies in exceptional circumstances. The officer was subject to cross-examination, correct? That's correct, and the officer said he did not remember. This is an e-mail reporting what is in what you don't dispute is a business record, the actual record that exists, right? That's correct, Your Honor. So if there was some error in admitting it in quite the way it was admitted, why isn't it harmless given that there's no dispute that the underlying document is a business record and the officer was available for cross-examination as to his credibility on whether he accurately reported what he saw in that document? The officer re-typed it. Just to take one example, the officer testified that— I'm just asking why it isn't harmless error. Well, the reason it's not harmless error is because if it was error, the document would need to be excluded under law. It would need to be excluded, and there was no other complement to this. Again, I may not be making myself clear to counsel this morning. It would have been in the underlying document, the police report, if they'd gotten the proper witness would have been a police record, right? But they have to have to—that's correct, Your Honor, but they have to— And so my point is, as we're looking at it, under the deferential standard that applies to evidentiary rulings by the district court, where the underlying document didn't have the evidence custodian come in, but you're not disputing that it was a business record. I mean, oftentimes these are stipulated to. And you're not—you weren't deprived of the opportunity to examine the police officer on the accuracy of what he saw. I'm not sure I see why this is the kind of thing where we ought to say that the district court so abused its discretion because it's so prejudiced to you. Well, Your Honor, if I may just answer the question. If Your Honors agree with us that the admission of the actual email was an error, which it plainly was, I would submit respectfully that the prejudice inquiry is not prejudice if they had managed to do their job and get the public record. And the prejudice inquiry is what would have happened if this hadn't been admitted. That is the way the prejudice— That's correct. I don't think that's correct. I mean, all kinds of evidence doesn't get admitted, but are you prejudiced by that where it's clear it would have been admitted? No, Your Honor. You cannot assume that they would have obtained the police record, one, and that the police record would have said what they wanted to say. Why not? For example, the officer testified that the actual arrest log would have noted on the arrest was made in front by a street peddler or inside the building. The arrest log would have said that, but because he was just hastily retyping a portion of the arrest log, we didn't get a chance to examine the arrest log to see if the arrest log says, hey, this was just a street peddler outside of our property instead of an individual in the middle. You didn't get a chance to examine the arrest log. What do you mean? Did you seek it in discovery? Did you— Well, it was their burden, and what the— No, no, no. When you say you didn't have a chance to get the arrest log, what do you mean? Right. Well, the only evidence at the trial about the obtaining of the – no, if I will – Prior to trial, did you have a chance to obtain the arrest log? We did not obtain the arrest log. The undisputed— No, no, no, no, no. Please answer my question. Did you have a chance, an opportunity to obtain the arrest log? Yes or no? If Your Honor, if I was to finish, I believe my answer will be satisfactory. The only evidence at trial was that the only entity that would be entitled to obtain the arrest log would be the complainant with regard to the property. That testimony is in the record, and so that is – they did not ask for it. You're saying the only evidence in the record of the trademark infringement was this email. But actually, we have this letter from Omega's lawyers that apparently was admitted without objection that says there were – as you know, there were these arrests in December 2010 and February 2011, and then that was admitted without objection, and then you had a discussion about, well, in response to that, 375 Canal got rid of the subtenant and did all this other stuff. Wouldn't it – wasn't it just already from other pieces of evidence in the trial that there was this earlier infringement? That email was not admitted for the truth of the matter of the allegations contained with regard to whether the December 7th – of course, that was admitted. Did you know that? Yes. What was it admitted for in your view? It was admitted for the dispute about knowledge of the plaintiff – of the defendant, whether we had sufficient knowledge in the dispute about – that we talked about at the beginning of this morning's presentation. Did you have knowledge of a fact that wasn't true? Is that what you're saying it was offered for? Well, certainly – I thought the argument was that you had knowledge and never disputed it. Well, so certainly with regard to a – the willful blindness standard, you can have a – something that would not be admissible at court that would put you on inquiry notice. No, but I thought it was offered not only to show that you were given notice, but that once you were given notice, you never disputed it, and therefore your failure to dispute it was argued as proof of the fact. Is that not so? It was never argued as proof of the fact until counsel's brief in this court. Our statements taking that allegation at face value were, if anything, triple hearsay. The fact that a responsible property owner takes the allegation of a – of a trademark holder seriously and responds by removing the property owner, removing the occupant, which is what a reasonable landlord would do, can then not be used in court to say that – The evidence that you acknowledge was admissible that you took an action in 2010 in response to an allegation of trademark infringement, right? That's correct, Your Honor. So couldn't the jury evaluate whether you were taking sufficient actions in response to trademark infringement after that and then rely on the undisputed later trademark infringement for liability? I feel we're kind of mixing up our legal categories here. On this piece of evidence, we are saying that the inclusion of the evidence prejudiced us. We're not saying that there would be insufficient evidence, you know, in some other respect of this court rejecting our understanding. But these are – these are related issues. Yes. In this particular case. But, look, we've kept you well past your time. You reserve two minutes for rebuttal. We'll hear from your friend, Mr. Noyes. Thank you. May it please the Court, I'll start where you descended with respect to evidence of prior infringement at 375 Canal before the May 2012 investigation and purchase of one counterfeit Omega watch. The evidence was, as Your Honor pointed out, a notice letter from Omega to 375 Canal, the defendant, stating that there had been counterfeit Omega watches that were seized and offered for sale at 375 Canal Street in December of 2010. Then there's the response email from outside counsel for the defendant. And in that email, she admits that there had been counterfeit goods bearing Omega's trademarks sold at the property. That is also the email that they rely on. And the only evidence they have to suggest that there was a subtenant or that the subtenant was ever removed. They're saying that it's admitted just so they have knowledge. And they're saying, well, as a diligent landlord, we're saying even if there's an allegation of trademark infringement, we're going to take action against the tenant regardless. And we're not admitting that that actually happened or not for purposes of liability for trademark infringement. But to avoid a risk, we're taking action against the person. So why isn't it just admitted for that purpose, and we don't actually have evidence in the record that there was an infringement in December 2010? Well, there was. Your Honor, Mr. Labose was cross-examined at trial. He's the principal of the defendant. And he testified that he accepted that letter as true absolutely. And this is also in the context of 375 Canal Street, which had been a haven for counterfeit. But that's what a landlord might do. They might accept a letter as true and act on its basis to avoid liability, but it doesn't mean that they're accepting it as true metaphysically for actual liability. He testified under oath, Your Honor. He accepted that the statements in that letter as true absolutely. That is what the jury heard. And, again, we have the response in October 2011 from Ms. Trito, who says, apparently the tenant sublet the space to an entity that was selling counterfeit goods bearing your client's trademarks. She's not relying on the notice letter that we sent. She is stating for a fact that they know that this trademark had been the counterfeit goods bearing Omega trademarks had been sold at 375 Canal Street. Now, there was other evidence in the record. Investigator Cole, who attended the raid in 2010, he testified, and he said he observed counterfeit Omega watches being confiscated at the property on that day. And, of course, you have Detective Tauti, who testified, was subject to cross-examination. The reliability of his e-mail to Omega's counsel and the statements in that e-mail were subject to cross-examination and argued to the jury. The jury considered that evidence and concluded that there was sufficient knowledge of prior infringement. So do you think that what the e-mail is is a copy of the arrest log, or is the e-mail a separate thing that we have to evaluate as to whether it's admissible? The e-mail is an extract of the Peddler's Task Force arrest log. That is what Officer Tauti testified to at trial. That's how he described it. That's how he described it. The reason it's an extract is because the Peddler's Task Force could not provide the entire arrest log. There was information about other brands. Doesn't that make this a different record than the actual arrest log? So this contains different information than the actual arrest log because this contains the information that could be provided to the holder of the trademark. It's akin to providing a redacted copy of the arrest log, Your Honor. He removed the information that Omega was not entitled to see, and that's why he provided the extract. That's admissible. It's not his statement. It's a statement he's copied. And so even if his e-mail is admissible because he created it and can identify it, how is the hearsay content of that e-mail, namely the extract from the police log, admissible? Your Honor, as we argued at trial, it is a business record and or a public record. The custodian testified to its maintenance and creation and all the other things you have to establish for a business record. Officer Tauti testified how these records were maintained, that they were prepared by someone with knowledge of the events, that this was the practice of the Peddler's Task Force. Did they need to be kept for future use by the business? Did they retain these e-mails that he sent from his Verizon account for future use by the police department? I don't believe, Your Honor, there's any specific evidence in the record on that. And what Judge Crotty understood when he heard the objection to this particular evidence was, again, this was an extract of a public record. He allowed it to come in. He allowed the officer to be cross-examined on the reliability of that statement. Reliability was tested. Reliability of the e-mail was tested. It was tested extensively at trial and argued at in closing by the defendant that the e-mail itself was unreliable. But, again, that one piece of evidence was only part of the evidence presented to the jury here showing willful contributory trademark infringement. If it was in any event, if it were error, it would be harmless? The error would be harmless, Your Honor. Can you turn to this knowledge requirement with respect to the denial of summary judgment and then with respect to the jury instructions? Yes, Your Honor. Again, this is a willful blindness case. This was not a situation where this was not eBay, not Tiffany in any sense of the way. This was a case where the evidence was presented to show that this ---- Your view isn't that Tiffany doesn't even apply, broadly speaking? No, Your Honor. Tiffany expressly recognized that a defendant can be liable under Inwood for willful blindness. And, in particular, it recognized that a service provider, like a landlord, could be liable for willful blindness. It said at 105, when a service provider has ---- There's no dispute here that Tiffany doesn't ---- There's no dispute that Tiffany applies to a landlord here. No one has disputed that. That is correct. Everyone operated, the district court operated, under the belief that Tiffany applied to a landlord liability context for contributory trademark infringement. Do you think it's necessary to show that there was the earlier infringement of the Omega trademark? Or is it possible to have liability where you show there's lots of infringement of trademarks going on, and then the Omega trademark comes along at time, too? And because they were willfully blind to trademark infringement in general, now we're going to impose liability on that. Is that permissible? What was necessary to show is that this particular defendant had knowledge that its premises had been used for infringing Omega's trademarks. Now, knowledge of other trademark infringement? They knew that its premises, its website, had been used for trademark infringement, but the court says that they're still not going to be liable as long as they took action in response to that knowledge. And so ---- And that was the issue for the jury here. Did this landlord act reasonably and do enough in view of all the evidence, in view of the fact that this particular store on Canal Street ---- In doing enough, is it in response to the infringement of Omega's marks or responses to infringement of marks in general? The question is whether they were willfully blind, whether they shielded themselves from knowing that someone occupying their storefront would infringe Omega's trademarks. And that is exactly what the evidence showed. So is your position that if what opposing counsel is saying is correct, that actually they ejected the subtenant who had infringed Omega's trademark at time one, then maybe they shouldn't have been held liable? You just don't think that that's a true story. Is that right? No. Whether they ejected the subtenant or not, I think, is irrelevant. The issue is, were they put on notice? Did they have knowledge of trademark infringement of Omega's marks? And then after that, what steps did they take? What remedial measures did they take? Were they willfully ---- What did you do besides ejecting the trademark infringement? Well, they didn't, Your Honor. All they did in this case, and their entire defense is based on that email we were the tenant had the offending subtenant removed. That was what they did. As Judge Crotty said in his summary judgment decision, all they did was report to Omega that the subtenant was removed. Now, at trial, the evidence that came in, they didn't investigate that further. They didn't put any signs up, any counterfeiting signs. They didn't check for back storage rooms. And when you see the evidence, you see the store in 2010, there are photos of that. And then you look at the evidence, the store in 2012, the back storeroom is still there. Your argument, or at least a theory that you're presenting, is that they don't have to just deal with the original infringer, but if there's some features of the property that make it maybe attractive to infringers, address those features of the property regardless of who the tenant is. Is that right? They cannot be willfully blind to occupants infringing the trademarks on their property, given the circumstances. May I also ask you, was there some evidence that made it at least ambiguous whether the tenant had been removed or whether the tenant had simply reconstituted itself under a different name or something like that? Yes, Your Honor. There is record evidence on that. So the evidence is the tenant was T.A. Discount. That was the tenant in 2010 when the raids occurred, and that was the tenant until after the lawsuit was filed. They were the same tenant. But the judge told the jury that it doesn't have to be the same infringer, right? Correct. So the jury did not, you know, was not relying on the idea. It was not imposing liability only if they were convinced that it was the same tenant in time. The jury was correctly instructed that even if a tenant had, a subtenant had been removed, they could look to see whether there was evidence that continued to supply the premises to other occupants and other occupants infringing Omega's trademarks. Let me get back to my question. Yes, Your Honor. I asked this because counsel suggested that there was no dispute about the tenant being removed. You're confirming that, in fact, there was some right? There was, Your Honor. In fact, it was argued in closing argument that the tenant was. On our review here, post-trial. Correct. We have to view the evidence in the light most favorable to the verdict, which could suggest that the jury had at least doubts, if not a finding in your favor on that. Correct? That's correct, Your Honor. And of course, Ms. Trito, who is the only evidence they offered that there was a subtenant or that it was removed, was Ms. Trito. Her email and then, of course, her testimony. She testified she had no specific recollection of the conversation, and she was confronted with her deposition testimony that that was she didn't ask the tenant to do anything. A reasonable jury, based on that evidence, could have concluded no subtenant either existed or was removed. I'm not sure I got an answer to my earlier question, which was, do you need to prove that there was the earlier infringement of Omega's marks, or could it be the case that there was just willful blindness to trademark infringement in general based on evidence of other infringement going on at the property, and then later Omega can come in and say, well, it turns out ours is one of the marks and we get liability for this. Does there need to be evidence of two Omega infringements? I do not believe we had to prove the first direct infringement. What we had to show was that this particular landlord would have known or had reason to know that Omega trademarks were infringed at 375 Canal Street. Is evidence of other marks being infringed probative of that? It is probative of knowledge of what a reasonable landlord would understand. What about handbags being sold at the property? Is that relevant to show that it's more likely that Omega marks were being infringed? It is, Your Honor. It is probative to show what was happening at this property, that all these goods were there, counterfeit goods that had been there for years. It's relevant but not exclusive. Relevant but not exclusive. Which you relied only on that. Exactly, Your Honor. We focused on Omega trademarks. We focused particularly on the timeframe between the notice letter in September 2011 and the investigation in 2012. Your answer to Judge Menasche's set of questions also I think answers the questions relating to the 56.1 statement that your friend has pointed out because that response is really irrelevant in one sense. We agree. And, in fact, we disputed that as immaterial for that reason in the 56.1 statement. Is there anything further? Nothing further. Thank you, Your Honors. Thank you. Just a couple of quick points, Your Honors. First, we heard counsel say that under their theory, under the jury instructions, under the summary judgment ruling, whether we had removed the person who allegedly infringed Omega's mark before or had infringed all of these other marks that Judge That is an accurate statement of the jury instructions of the summary judgment ruling. It means that if Your Honors were to affirm the ruling on appeal, that any time you had one infringement one year ago, three years ago, seven years ago, that the landlord would then have to set up secret shopper stings on every new subtenant, every new occupant that comes into a property every single time. Otherwise, there would just be a trial every time about whether We have a trial here. We have a trial record. And viewing it in the light most favorable to the jury verdict, we would have to conclude that not only did they find there was a previous Omega sale, that there were previous sales of many other counterfeit items, and that your client obligated himself to take certain actions to minimize the risk of counterfeit sales, but that evidence like the storeroom in the back that was not removed, et cetera, indicated that he had not. So to that extent, we don't have to decide this case on a theory that narrows the evidence. We get to consider it on the evidence that was before the jury. Why isn't that enough? With respect, it's very important that I explain why that is not right. Please. The challenge here is to the jury instructions. It's not a sufficiency of the evidence challenge of 50B. The jury instructions wrongly stated the law, and there was at least a serious possibility that they did not find that it was the same infringer. This was a new theory that was – it was a throwaway line in one cross-examination, a throwaway line, a closing argument. It was a big theory that was made on appellate briefs. So the jury instruction – I mean, there are two pages, but I'm looking at 2630. 375 Canal may be contributorily liable for infringement if it continues to supply its services, the tenancies, after 375 Canal either knew or had reason to know that a tenant, subtenant, or other occupant of its premises were selling, offering for sale, or distributing products bearing counterfeits of Omega's trademarks. That's right, Your Honor. What is wrong? What part of that, what component of that is wrong? The fact that it's referring to property and not the one infringer. And we heard counsel today say, and another admission, that under those instructions, it is irrelevant. He said irrelevant whether we removed the other occupant. It is undisputed that if we – if Your Honor's – Let's accept that the instructions allowed you to find – allowed the jury to find liability even if it's a different infringer. What about the argument that there are just some features of the property that make it – that allow it to facilitate trademark infringement? And we know that there's a history of trademark infringement, and so regardless of who the tenant is, it's willfully blind if the landlord doesn't take some action to prevent that trademark infringement from happening, like removing the storerooms or the bins or something. Well, two problems with that, Your Honor. Well, two problems with that, Your Honor. First is the specific phrasing of Inwood, Tiffany, and Sony that it has to be identified infringer. But even – So what's the rationale? Even putting that aside, the only feature of this property that they reference is storeroom, is drawers. Every store has drawers. Omega stores have drawers where they put the watches. The notion that there was something nefarious about the building, that was certainly not a major theory that was – like the physical features of the building. That was not a major – But there's lots of trademark infringement of lots of different marks going on at this property, so something is happening. Whether it just happens to be a popular location for trademark infringers or there's some features of the property, it seems like something is going on. Again, we didn't – Or maybe the reason is infringers know that this landlord is tolerating infringement to a degree that other landlords might not, and so that's why they're all seeking out this property. The evidence undisputed that every time we were told that there was an infringement, we kicked the person out. There was not a single problem for a full year. It is disputed. It's disputed as to whether you actually kicked the person out, and it's disputed as to whether kicking the person out would be enough in the absence of signs or monitoring or something else. Well, so, Your Honor, the signs and monitoring, that conflates the issues of remedial measures, which is a separate inquiry from the knowledge. The knowledge needs to go to the individual infringer. And if Your Honors would recall – Willful blindness, right? If you know that it's going on and you don't take measures to stop it or to discover that it's going on, then – And I guess – and if Your Honors were to go on willful blindness, then the question is, does Your Honors want to establish a rule of law in the circuit that any time you have a prior infringement and you kick the tenant out, that every time you have a new tenant comes in, it has nothing to do with the old tenant, you have to set up secret shopper stings on that new tenant over and over again. In this case, it was undisputed. We sent people to take a look. There was no watches on display. They sent people to take a look two times after we kicked out the old tenant. No watches on display. If the – Your Honors accept this verdict and affirm it, then the rule of law would be that if there's ever a prior infringement one year ago, three years ago, seven years ago, then new tenants have to be continuously investigated. But if there was more, the jury had more than that before that. It didn't have anything in the year before the alleged infringement. There was absolutely no evidence that anything had happened for a full year despite multiple visual inspections by the other side, by us. And that's why they need to rely so heavily on this jury instruction and why you heard counsel on the other side say that removing the old tenant was irrelevant. He said irrelevant because if he did not say that, they would have to face up to the fact that in the prior year, despite multiple visual inspections, there were absolutely no problems. Yes, there were problems three years ago. The inspections. Yes. The jury could have found, especially those by your client, were inadequate. I mean, the jury heard what constituted the inspections of your client, which was looking in the case, right? Well, their trained investigators came twice. That's correct. They could have discounted ours. Their trained investigators came twice. Let me just stick with one question. Yes, Your Honor. So the jury could have heard that's what your client did, and given the history of what of infringement, decided that was inadequate, that it was willful blindness because you were doing the most superficial investigation. The jury could have found that, right? And that would have been legally insufficient under the narrow. Let's not talk about the ultimate finding. You've argued to us that you were conducting inspections, and I'm suggesting to you that it was within the jury's purview to conclude that those inspections were not adequate given the history. With respect, Your Honor, it was not in the jury's purview. You're saying the jury had to find those to be adequate investigations? No, Your Honor. Okay. What we are saying is that in order to find the very narrow standard of willful blindness, there would have to be a reason for us to suspect the current occupant of our property. They did not put on one piece of evidence that would suggest any reason to suspect the current occupant of the property. All of the evidence that was put on about other brands, about Omega brands, were about other removed occupants, which are indistinguishable. How about the evidence that suggested you hadn't? Sorry, Your Honor? How about the evidence that suggested that you hadn't? Your Honor, Your Honor heard counsel say that that evidence under the jury instruction was irrelevant. So they could have put that in the jury instruction that it was – that the jury was told it was irrelevant. I saw what the jury was charged. You're saying that – I mean, you're stating that this is an absolute fact. It was a disputed fact whether you had removed the tenant. It was not a material fact under the jury instructions, which is why counsel today stood up in court and said that the question from Judge Menasche whether the tenant was removed was irrelevant. You don't think it was irrelevant to what kind of inspections and what kind of due diligence you would have had to do whether the tenant in place was the former infringer or not? Under the – I thought that was the whole point of your insistence on one, was that it made a great deal of difference whether it was the same tenant. Under our theory, at the summary judgment stage and at jury instruction, that was the key difference. Under their theory, adopted by the district court, it was irrelevant. That's counsel's words here today. That was the theory before the court. We're only interested in what the jury was told was relevant and irrelevant. Yes. And under the jury instructions, that would – It was told by the district court that it did not have to be the same infringer. So even if the jury thought that the infringer had been removed, it would still impose liability on the tenant. Right. And it didn't have to have any finding that there was any reason to suspect the new tenant. Right. And what about the argument we just had a moment ago about whether it's relevant that there was lots of infringement of non-Omega marks going on, and that goes to willful blindness. So isn't it probative that – as to whether you were willfully blind, that there's lots of infringement of lots of different marks going on at this property? Well, again, all of those were for prior removed subtenants. But then the jury can – if that is relevant, the jury can decide whether you took adequate measures in response to all of that evidence. No, Your Honor. The key point in the end of the ballgame is whether the one, as Inwood and Tiffin use it, if there was a reason to suspect the one, whether we had reason to suspect our current occupant and whether we willfully blinded ourselves to that reason to suspect. You were hanging your hat – and I'm just trying to wrap this up a little bit – but you were hanging your hat on the word the one. And if we agree with you, then you think you should prevail. If we disagree with you, then you've got other problems. Oh, well, one and identified individuals. Yes, yes. That's the gist of our argument on this part. We also have the other argument about the admissibility of the e-mails and – The evidentiary, right. Yes. But on this argument – But on the core issue of knowledge and so on and what needs to be proved in the jury instructions, the one and plus the additional language. One and identified individuals. That's correct. Thank you very much. Thank you, Your Honor. We'll reserve decision.